NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

_____

GAIL BENTLEY,               :
                                :

       Plaintiff,     :        Hon. Dennis M. Cavanaugh
                                :

      v.                :        **OPINION**
                                :

                                :        Civil Action No: 10-2714 (DMC)

COMMISSIONER OF SOCIAL    :
SECURITY,               :
                                :

       Defendant.     :
_____:

<u>DENNIS M. CAVANAUGH, U.S.D.J.</u>:

     This matter comes before the Court upon the appeal of Gail Bentley ("Plaintiff") from the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for a period of disability and disability insurance benefits under Title II of the Social Security Act ("Act") and for Supplemental Security Income ("SSI") under Title XVI of the Act. This Court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure.

     As detailed below, the final decision entered by the Administrative Law Judge ("ALJ") is **affirmed.**

# I.  BACKGROUND

## A.  PROCEDURAL HISTORY

On January 30, 2006, Plaintiff filed an application for disability and disability insurance benefits alleging disability beginning on July 1, 2005. (Administrative Transcript ("Tr.") at 64-68). Plaintiff's claim was initially denied on May 30, 2006 (Tr. 37-41) and upon reconsideration on February 9, 2007 (Tr.  43-45).  Thereafter, on May 2, 2007, Plaintiff filed a written request for a hearing. (Tr. 46).  On April 2, 2008, Plaintiff, appearing pro se, testified at a hearing before ALJ Dennis O'Leary. (Tr. 23-34).  On April 25, 2008, the ALJ denied Plaintiff's claims. (Tr. 9-20). Plaintiff sought review of the decision with the Appeals Council on June 3, 2008. (Tr. 8).[1]  On April 29, 2010, the Appeals Council denied Plaintiff's request. (Tr. 1-5).  On May 27, 2010, Plaintiff filed a timely complaint with this Court seeking judicial review.

## B.  FACTUAL HISTORY

### 1.  The Findings of the Administrative Law Judge

In his decision, ALJ O'Leary made the following seven (7) findings regarding Plaintiff's application for a period of disability and disability insurance benefits: (1) Plaintiff meets the insured status requirements of the Social Security Act through March 30, 2010; (2) Plaintiff has not engaged in substantial gainful activity since July 1, 2005, the alleged onset date; (3) Plaintiff has the following severe impairments: uterine prolapse, left knee arthritis, arthritis of the right hip, status-post fracture, status-post right hip fusion surgery, a history of a fracture of the pelvis, hypertension, neck pain and obesity; (4) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix

---

[1]  On June 26, 2009, Plaintiff obtained counsel in this matter. (Tr. 7).

1 ("Listing(s)"); (5) Plaintiff has residual functional capacity ("RFP") to perform work involving lifting and carrying up to ten pounds occasionally, standing or walking up to two hours and sitting up to six hours in an eight-hour day; (6) Plaintiff is capable of performing her past relevant work as a clerical banker because such work does not require the performance of work-related activities precluded by the Plaintiff's RFC; and (7) Plaintiff has not been under a disability, as defined in the Social Security Act, from July 1, 2005 through the date of the decision.

## 2. Plaintiff's Medical History and Evidence

Plaintiff alleges that she has been disabled since July 1, 2005, as a result of her orthopedic, neurological and hypertensive condition and obesity. Plaintiff's medical history and the evidence pertaining to her impairment are summarized below.

### I. Relevant Medical History Up To Period of Alleged Onset Date

On September 9, 2002, Plaintiff received a pelvic ultrasound examination which revealed a mild retroverted uterus and a mildly thickened endometrium which may be secondary to the Plaintiff's menstrual cycle. (Tr. 157). On June 28, 2005, Raja Rahula, M.D., examined the Plaintiff and noted findings of first degree genital prolapse. (Tr. 158-60). Dr. Rahula noted that the Plaintiff was not a candidate for surgery for this condition because of her past orthopedic surgery.[2] (Tr. 158). Plaintiff's blood pressure was reported at 130/80 mmHg and her weight at 208 pounds. (Tr. 158). In his report, Dr. Rahula determined that Plaintiff was limited to lifting and carrying ten pounds, could stand or walk up to six hours per day, had no limitation in the time she could sit and had some

---

[2] The Plaintiff stated that in 1984 she was involved in a car accident that resulted in her breaking her hip and pelvis and needing surgery on her hip to put a pin in it. (Tr. 28-29, 169). At her hearing, Plaintiff stated that Dr. Rahula told her that she can not have the surgery for her condition because the pin in her hip prevented her from being put in the proper position for the surgery. (Tr. 28).

limitation in her ability to push and/or pull things. (Tr. 160).  Dr. Rahula also concluded that there

were no other conditions that limited Plaintiff's ability to do work related activities. (Tr. 160).

## II.  Consultive Examination

On December 27, 2006, Samuel Wilchfort, M.D., performed a consultive examination. (Tr.

169-71). Dr. Wilchfort noted that the Plaintiff has a history of hypertension that is longstanding,

having had it for at least fifteen years. (Tr. 169).  Dr. Wilchfort reported that the Plaintiff should be

on daily medication for this condition but that she ran out two to three days earlier and has not been

taking them in that time. (Tr. 169).  On the day of the examination, Plaintiff's blood pressure was

measured at 170/112 mmHg, with her resting heart rate at eighty. (Tr. 170).  Plaintiff had never had

a stroke or a heart attack. (Tr. 169).  She also did not have chest pain. (Tr. 169).  Plaintiff did

complain of shortness of breath with exertion. (Tr. 169).  Dr. Wilchfort noted at the time of the

examination that Plaintiff's respirations were eighteen and nonlabored, she was not in distress and

she had no trouble getting up on or off the examining table. (Tr. 170).

Dr. Wilchfort noted that the Plaintiff complained of pain in her left knee, right hip and

somewhat in the lower back. (Tr. 169).  Plaintiff gave her history of difficulty walking because of

pain in multiple areas (Tr. 169).  Plaintiff's review of systems was positive for right shoulder pain.[3]

(Tr. 169).  Plaintiff also complained of mild stress incontinence, particularly with coughing and

laughing, for which she is not using any pads. (Tr. 169).

During Plaintiff's physical examination, her height was sixty-five inches and her weight was

204 pounds. (Tr. 170).  Her vision was 20/20 with glasses. (Tr. 170).  The Plaintiff's lungs were

clear.  (Tr. 170).  Her cardiac examination revealed S1 and S2 as normal and an S4 gallop. (Tr. 170).

---

[3]In 2005, Plaintiff had received a steroid injection in her right shoulder for pain.

Plaintiff had no organomegaly. (Tr. 170). Plaintiff's peripheral pulses and extremities were normal. (Tr. 170). The range of motion for her hands, wrists and elbows were normal. (Tr. 170). Doctor Wilchfort noted Plaintiff's shoulders as normal as well as her cervical spine flexion and extension. At the lumbar spine, Plaintiff could bend over to eighty-five degrees. (Tr. 170). The Plaintiff could straight leg raise forty degrees on the right and sixty degrees on the left. (Tr. 170). Concerning her hips, Plaintiff can flex her right hip to forty-five to fifty degrees and her left to 100 degrees. (Tr. 170). As to her knees, the right knee has normal flexion and extension while the left knee flexion is 100 with normal extension. (Tr. 170). Dr. Wilchfort found no crepitus. (Tr. 170). He noted that Plaintiff can toe-walk and heel-walk and that her ankles are normal. (Tr. 170). He also determined that gait was normal. (Tr. 170). Dr. Wilchfort noted that her hip did cause Plaintiff some problems, namely that she could not squat because of hip pain and that when she gets dressed, she has trouble putting on her socks as she cannot flex her hip to reach her foot and thus has to put on her socks in a different manner. (Tr. 170). Plaintiff's neurological tests also showed normal results in her mental status, cranial nerves, muscle strength, grip strength, pinprick, vibration, reflexes and fine hand movements examinations. (Tr. 170).

In his summary, Dr. Wilchfort noted that the forty-four year old Plaintiff had problems which included: (1) hypertension that is longstanding and blood pressure that is elevated (noting Plaintiff was off her medications); (2) arthritis of the left knee with decreased range of motion, complaints of pain in the right shoulder with normal range of motion and status post surgery on the right hip with decreased range of motion and complaints of pain with walking; (3) prolapsed uterus; and (4) stress incontinence. (Tr. 170).

### III. Physical Residual Functional Capacity ("RFC") Assessment

On January 23, 2007, a RFC Assessment was completed by Nikolaos Galakos, M.D. (Tr. 174-81). With regards to exertional limitations, Dr. Galakos reported that Plaintiff can occasionally lift twenty pounds, frequently lift ten pounds, can stand and/or walk with normal breaks about six hours in an eight-hour workday, can sit with normal breaks for a total of about six hours in an eight-hour workday and is not limited in her ability to push and/or pull things. (Tr. 175). Dr. Galakos noted Plaintiff's postural limitations, such as only occasionally being able to climb a ramp or stairs, balancing, stooping, kneeling, crouching and crawling and never being able to climb ladders, ropes or scaffolds. (Tr. 176). Dr. Galakos determined Plaintiff had no manipulative, visual, communicative or environmental limitations. (Tr. 177-78). The doctor reported that Plaintiff complained of uterine prolapse and pains in her legs and hips. (Tr. 179). He noted that she was not taking any analgesics. (Tr. 179). Dr. Galakos also wrote that Plaintiff's severity of her symptoms is partially proportionate to the expected severity or expected duration of Plaintiff's medically determinable impairments. (Tr. 179).

### IV. Emergency Room Reports

Plaintiff was later seen several times in the Jersey City Medical Center Emergency Department. On March 28, 2007, when Plaintiff was seen in the Emergency Department she complained of generalized body ache and a cough. (Tr. 257-60). X-Rays of Plaintiff's left knee revealed moderate arthritic changes. (Tr. 259).

On April 5, 2007, Plaintiff was again seen, complaining of a cough lasting three weeks and pain in the right side of her back. (Tr. 247-56). X-rays of Plaintiff's chest revealed a normal sized heart and clear lungs. (Tr. 255). It was determined that Plaintiff had hypertension, a urinary tract infection and bronchitis. (Tr. 247).

On May 30, 2007, Plaintiff was seen for left ankle pain and also complained of right shoulder pain. (Tr. 235-46). An X-ray of Plaintiff's left ankle revealed no fracture or dislocation. (Tr. 246).

On August 16, 2007, Plaintiff was seen for near syncope and uncontrolled hypertension. (Tr. 192-94, 200-34). An electrocardiogram revealed a septal myocardial infarction, age undetermined, with sinus arrhythmia, while her cardiac injury marker was within normal limits. (Tr. 192, 222, 225).

On December 5, 2007, Plaintiff had X-rays taken of her cervical spine which revealed osteophytes involving the fourth, fifth and sixth cervical vertebrae. (Tr. 196). X-rays of her lumbar spine revealed no abnormalities. (Tr. 195). X-rays of Plaintiff's right hip revealed degenerative osteoarthritic changes with joint space narrowing and sclerosis, status-post right hip fusion while x-rays of the left hip were negative. (Tr. 198).

On February 16, 2008, Plaintiff was seen for right wrist pain. (Tr. 182-191). Plaintiff denied trauma. (Tr. 188, 189). X-rays of the right wrist were normal. (Tr. 191). There was no fracture or dislocation. (Tr. 191). Plaintiff was given Toradol and a splint was prescribed on discharge. (Tr. 182, 188).

### 3. Plaintiff's Testimony at Hearing

At a hearing before the ALJ on April 2, 2008, Plaintiff appeared pro se. The ALJ began the hearing with an opening statement that described the hearing process to the Plaintiff. (Tr. 23-24). The ALJ explained how he would review the evidence before him, both what is in the Plaintiff's file as well as her testimony during the hearing, to reach a decision. (Tr. 23). He explained to the Plaintiff that after he was done asking questions, "if there [was] anything else that you think that I should know that we didn't talk about and you feel it's important, please take advantage of the opportunity to tell me." (Tr. 23-24). The Plaintiff replied "Okay." (Tr. 24).

The ALJ also informed Plaintiff that although she is appearing pro se, she could have an attorney present if she wanted and that he would give her time to get an attorney. (Tr. 24). The ALJ stated that some people want an attorney and others proceed without one and that "[t]here's really no right or wrong way to this. The question is what you're most comfortable with." (Tr. 24). He explained that if Plaintiff could not afford an attorney, there are services that Plaintiff may be able to have represent her either at no charge or at a contingency basis. (Tr. 24). The Plaintiff responded that she would "proceed without one" and then stated "[b]een this long." (Tr. 24).

Plaintiff indicated that she was forty-six years old and was a high school graduate who took a few trade classes. (Tr. 24). She is certified in finance and data entry. (Tr. 24). Plaintiff last worked in a retail position as a department manager on June 28, 2005. (Tr. 25). She had that position for approximately three years. (Tr. 26). In that position she was on her feet all day pulling and hanging racks, unpacking garments and related work. (Tr. 26). Plaintiff stated that she informed her employer of Dr. Rahula's findings shortly after visiting with him, and her employer told her to go home. (Tr. 26) Plaintiff was then told she could not come back. (Tr. 26). Prior to this position, Plaintiff explained that she had another position in retail that was "a little bit more laid back," as she was not on her feet for the whole day but rather dealt with paperwork and worked on a computer. (Tr. 27).

From 1990 until 2001 (when she was let go because of down sizing), Plaintiff worked for a bank. (Tr. 27-28). She began as a tax reclaim clerk and then moved to the research area where she was "doing a lot of paperwork, filing, dealing with the management team and upper management." (Tr. 28).

Plaintiff then testified about her medical condition. (Tr. 28-33). She explained to the ALJ

that Dr. Rahula had told her she was not a candidate for surgery because of the pin in her hip from a previous car accident. (Tr. 28-29). Plaintiff testified that as a result of her broken pelvis/hip from the car accident, she was limited in what she could do and had to stand and stretch. (Tr. 28-29). Plaintiff takes over the counter medications such as Motrin or Tylenol. (Tr. 29). Plaintiff testified that she is having spasms in her uterus area and was having a little discomfort, and would thus be going to the OB/GYN approximately a week after the hearing date. (Tr. 29, 32).

Plaintiff also testified that she had arthritis, namely in her right shoulder, right hip, left knee and left ankle as well as a herniated, bulging disc mostly in the sixth vertebrae. (Tr. 30). Plaintiff stated that she has symptoms if she does too much house work, so that her arm or leg may go limp. (Tr. 30). She also claimed that she sometimes has difficulty sleeping. (Tr. 30). Plaintiff testified that because she has a high tolerance for pain - she just overlooks certain things. (Tr. 30). Plaintiff also claimed that her knee or ankle would swell and would sometimes give out while she was walking, but that no one had ever suggested she use a cane. (Tr. 30). Plaintiff testified that these conditions give her pain in the neck and she has headaches "every now and then." (Tr. 31-32). The ALJ asked Plaintiff if they had covered all of her physical problems and she responded, "I think so." (Tr. 32). Plaintiff later stated that she did not go back and forth to doctors because she did not have insurance at those times but has recently been accepted into Medicaid so would be going to her OB/GYN. (Tr. 32).

Plaintiff testified that she lived with her children, which includes a sixteen year-old and a friend. (Tr. 31). Her twenty-five year-old daughter and her children (Plaintiff's grandchildren) come to visit and Plaintiff takes care of the grandchildren all day. (Tr. 31). At her home, Plaintiff cooks, does housework, helps her grandchildren do homework and does the laundry. (Tr. 31). Plaintiff

stated that she does laundry about once a month because she does not want to suffer doing it, as the task requires her to go up and down twenty stairs. (Tr. 31).   Because Plaintiff does not drive, she either calls a taxi or takes the bus when she wants to travel from her home.[4] Id.

The ALJ asked Plaintiff a hypothetical question: if she was called by the bank where she had worked on the day after the hearing and told that her job was open would she be able to do it and if not, why?  (Tr. 32) The Plaintiff responded, "I think so as long as I don't have to sit for a long period of time." Id.

The ALJ asked Plaintiff about additional medical documents that Plaintiff then brought with her that were not in the file. Id.  Plaintiff submitted her medical documents from March 2007 and onward to which the ALJ stated that he is "obviously going to have to look at these in some detail." (Tr. 33).

The ALJ stated that he had no further questions and asked the Plaintiff if there was anything else that she wanted to tell him that they had not talked about. Id.  Plaintiff responded that she believed she did and gave some information in response to a previously asked question by the ALJ dealing with the issue of her income. (Tr. 31, 33).  The ALJ then closed the proceeding. (Tr. 34).

## II. STANDARD OF REVIEW

A reviewing court will uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).   Substantial evidence is "more than a mere scintilla . . . but may be less than a preponderance." Woody v. Sec'y of Health & Human Servs, 859 F.2d 1156, 1159 (3d Cir. 1988). It "does not mean a large or considerable amount of evidence, but rather such relevant evidence as

---

[4]  Plaintiff had previously disclosed that she did not have a car. (See Tr. 102).

a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988) (citation and internal quotation omitted). Not all evidence is considered "substantial." For instance,

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g. that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion.

Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)). The ALJ must make specific findings of fact to support his ultimate conclusions. Stewart v. Secretary of Sec'y of Health, Educ. & Welfare, 714 F.2d 287, 290 (3d Cir. 1983).

The "substantial evidence standard is a deferential standard of review." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). As such, it does not matter if this Court "acting de novo might have reached a different conclusion" than the Commissioner. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). "The district court . . . is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)). A Court must nevertheless "review the evidence in its totality." Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). In doing so, the Court "must 'take into account whatever in the record fairly detracts from its weight.'" Id. (quoting Willibanks v. Sec'y of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988)).

To properly review the findings of the ALJ, the court needs access to the ALJ's reasoning. Accordingly,

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of Health, Educ. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977)).  A court must further assess whether the ALJ, when confronted with conflicting evidence, "adequately explain[ed] in the record his reasons for rejecting or discrediting competent evidence."  Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  If the ALJ fails to properly indicate why evidence was rejected, the court is not permitted to determine whether the evidence was discredited or simply ignored.  See Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citing Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)).

### III.  APPLICABLE LAW

**A.  THE FIVE-STEP PROCESS**

A claimant's eligibility for benefits is governed by 42 U.S.C. § 1382. A claimant is considered disabled under the Social Security Act if he or she is unable to "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A).  A claimant bears the burden of establishing his or her disability.  Id. § 423(d)(5).

To make a disability determination, the Commissioner follows a five-step process pursuant

to 20 C.F.R. § 416.920(a). Under the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 416.920(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties and is done (or intended) for pay or profit. 20 C.F.R. § 416.972. If the claimant establishes that she is not currently engaged in such activity, the Commissioner then determines whether, under step two, the claimant suffers from a severe impairment or combination of impairments. 20 C.F.R. § 416.920(a)(4)(ii). The severe impairment or combination of impairments must "significantly limit[] [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). The impairment or combination of impairments "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 416.909. If the Commissioner finds a severe impairment or combination of impairments, he then proceeds to step three, where he must determine whether the claimant's impairment(s) is equal to or exceeds one of those included in the Listing of Impairments in Appendix 1 of the regulations ("Listings"). 20 C.F.R. § 416.920(d). Upon such a finding, the claimant is presumed to be disabled and is automatically entitled to benefits. Id. If, however, the claimant does not meet this burden, the Commissioner moves to the final two steps.

Step four requires the Commissioner to determine whether the claimant's residual functional capacity sufficiently allows her to resume her previous work. 20 C.F.R. § 416.920(e). If the claimant can return to her previous work, then she is not disabled and therefore cannot obtain benefits. Id. If, however, the Commissioner determines that the claimant is unable to return to her prior work, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner, who must find that the Claimant can perform other work consistent with her medical impairments, age, education, past work experience and RFC. 20 C.F.R. § 416.920(g). Should the Commissioner

-13-

fail to meet this burden, the claimant is entitled to Social Security benefits.   20 C.F.R. § 416.920(a)(4)(v).

### B.   THE REQUIREMENT OF OBJECTIVE EVIDENCE

Under the Act, disability must be established by objective medical evidence.  "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require."  42 U.S.C. § 423(d)(5)(A).  Notably, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section."  Id.  Specifically, a finding that one is disabled requires:

> [M]edical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph . . . would lead to a conclusion that the individual is under a disability.

Id.; see 42 U.S.C. § 1382c(a)(3)(A).  Credibility is a significant factor.  When examining the record:

> The adjudicator must evaluate the intensity, persistence and limiting effects of the [claimant's] symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work-related activities. To do this, the adjudicator must determine the credibility of the individual's statements based on consideration of the entire case record. The requirement for a finding of credibility is found in 20 C.F.R. § 416.929(c)(4).

A claimant's symptoms then, may be discredited "unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."  20 C.F.R. § 416.929(b); see Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).

### IV.  ANALYSIS

On appeal, Plaintiff argues that the ALJ's decision should be reversed because the ALJ committed several errors in his conduct at the administrative hearing, and also because the ALJ

erred in two steps of the process.  Plaintiff argues that in step three, the ALJ both incorrectly

refused to consider Plaintiff's hypertension as matching or equivalent to an impairment in the

Listings and failed to find Plaintiff's combination of all impairments equivalent to such a listed

impairment.  Further, in step four, Plaintiff alleges that the ALJ erred in its RFC determination

and in finding that Plaintiff can perform past relevant work.

### A.  STANDARD OF CONDUCT OF ALJ AT PRO SE CLAIMANT'S HEARING

#### 1.  Valid Waiver of Counsel

Plaintiff alleges that the ALJ did not elicit a knowing and intelligent (and thus valid and

enforceable) waiver of her right to counsel at the hearing.  Plaintiff claims that other courts have

insisted that in order to insure a knowing and intelligent waiver of counsel, the ALJ must explain

to the pro se claimant the valuable role an attorney could play in the proceedings, the possibility

of free counsel and the limitations on attorney's fees to a certain percent of any eventual award.

(Pl's Br. 5-6) (citing Vance v. Heckler, 579 F. Supp. 318 (N.D. Ill. 1984))).  Plaintiff argues that

she was never told of the valuable role an attorney may play in the prosecution of her case and

thus any waiver would not have been knowledgeable and valid.  Plaintiff states that without such

valid waiver, such a lack of counsel should warrant a remand because of the prejudice or

unfairness in the conduct of the hearing or the issuance of the decision.  The Court disagrees as it

deems the waiver valid.

"Though a claimant does not have a constitutional right to counsel at a social security

disability hearing, she does have a statutory and regulatory right to counsel at such a hearing."

Vivaritas v. Comm'r of Soc. Sec., 264 Fed. Appx. 155, 157 (3d Cir. 2008) (citing 42 U.S.C. §

406; 20 C.F.R. § 404.1705). In Vivaritas, unlike the present case, the plaintiff was alleged to

have mental limitations, the issue of which arose at her hearing, that in part lead to a reversal and

remand on the issue of whether the Plaintiff's waiver was really knowing and intelligent.

Vivaritas v. Comm'r of Soc. Sec., 264 Fed. Appx. 155 (3d Cir. 2008).  A lack of counsel, itself,

is not sufficient cause for remand.  Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

The claimant must be given a notice of her right to counsel and can only waive this right by a

knowing and intelligent waiver. Vivaritas, 264 Fed. Appx. at 157.

     The Vivaritas court examined an almost identical standard as the one stated in Vance by

the Seventh Circuit Court of Appeals, stating that "[a]lthough we have referred to other decisions

by other court of appeals in describing the standards for [S]ocial [S]ecurity appeals, we have not

required that ALJs explain each of the listed items that the Court of Appeals for the Seventh

Circuit case law requires." Vivaritas, 264 Fed. Appx. at 157, n.1.  While all of the Seventh

Circuit's standards do not have to be met to show a valid waiver in this Circuit, in this case, each

in fact occurred on multiple occasions.

     Plaintiff was informed of her right to counsel when she received her notice of

disapproved claim.[5]  (Tr. 37-39).  In her request for reconsideration, Plaintiff stated that she

understands that she has a right to be represented at the reconsideration.  (Tr. 42).  In her request

-----

[5] The relevant language of the Notice of Disapproved Claim, under the heading "If You
Want Help With Your Appeal" reads:

> You can have a friend, lawyer, or someone else help you.  There are groups that can help
> you find a lawyer or give you free legal services if you qualify.  There are also lawyers
> who do not charge unless you win your appeal.  Your local Social Security office has a
> list of groups that can help with your appeal.

> If you get someone to help you, you should let us know.  If you hire someone, we must
> approve the fee before he or she can collect it.  And if you hire a lawyer, we will withhold
> up to 25 percent of any past due Social Security benefits to pay toward the fee.  (Tr. 38).

for a hearing by an Administrative Law Judge, the form notes the claimant's right to representation at the hearing and states that if the claimant is not represented but would like to be, the Social Security office will give the claimant a list of legal referral and service organizations.  (Tr. 46).  In a letter from the Office of Disability Adjudication and Review acknowledging Plaintiff's request for a hearing, Plaintiff is reminded of her right to representation, as the letter reads "a representative can help you get evidence, prepare for the hearing and present your case at the hearing." (Tr. 47) The letter suggests that if the claimant decides to have a representative, she should find one immediately so that the representative can start preparing the case.  (Tr. 47).  Plaintiff is again reminded that she may be charged, but there are other organizations which may represent her free of charge.  (Tr. 47).  The names and contact information of two private attorneys are included with the letter, in case claimant was not successful in finding a private attorney. (Tr. 49).  Approximately a month before her hearing, Plaintiff received a notice of hearing which also reminded her that she may choose to have a representative at the hearing. (Tr. 52).  Finally, at the hearing itself, prior to having her testimony taken, the ALJ asked Plaintiff if she wanted to have an attorney represent her and if so, he would give her time to get one. (Tr. 23-24).[6]  Plaintiff declined. (Tr. 24).[7]

---

[6] Plaintiff alleges that the ALJ did not follow the Commissioner's Guidelines for the conduct of hearings in eliciting a waiver. (Pl's Br. 6-7 (citing HALLEX-1-2-6-52A)).  The Court finds that the ALJ did comply with the Commissioner's Guidelines as he informed plaintiff of her right to representation, including specifically mentioning the possibility of free legal counsel or contingency representation, as well as offered her time should she choose to proceed with representation.

[7] Plaintiff argues that her reason for denying counsel, as stated at the hearing, was that it had "[b]een this long," (Tr. 24) and she did not want to delay her case any more.  (Pl's Br. 8-10).  Plaintiff's alleged reason for refusing this final reminder of her right to counsel does not change the analysis of a knowing and intelligent waiver.

Therefore, Plaintiff was informed of, and had an opportunity to exercise, her right to counsel on numerous occasions, all of which were declined by Plaintiff prior to her given testimony at her hearing. .  These occasions include the: number of writings Plaintiff received mentioning her right to counsel; detailed descriptions of her ability to hire counsel or perhaps her ability to find free counsel;  limitation on any payment due to any such fees counsel may charge; description of the value of counsel; suggestion that it be found immediately if so desired; stated availability of the agency to help find counsel (and the suggested names of counsel given); and final reminder by the ALJ of her right at the hearing itself.  Taken together, the only conclusion that can be reached is that plaintiff exercised a knowledgeable and intelligent and thus valid waiver.  See, e.g., Boyd v. Barnhart, 98 Fed. Appx. 146 (3d Cir. 2004) (finding claimant knowingly waived right to counsel having received three notices of right to representation and ALJ gave instructions to claimant regarding availability of counsel and offered to continue hearing for claimant to secure counsel).  See also Glenn v. Comm'r of Soc. Sec., 67 Fed. Appx. 715, 718 (3d Cir. 2003) (finding appellant's claim that waiver of counsel was not knowing and voluntary to be without merit where appellant received and was notified of right of counsel in mailed notices prior to hearing and by ALJ at hearing); Phifer v. Comm'r of Soc. Sec., 84 Fed. Appx. 189 (3d Cir. 2003) (finding claim without merit and stating that notice was sufficient where appellant received multiple written letters advising of availability of counsel and also notice at hearing by ALJ).

Even if the waiver was not valid, a remand would be appropriate only if Plaintiff was prejudiced by a lack of counsel.  For the reasons stated infra, the Court does not find Plaintiff

was prejudiced by lack of counsel.

## 2. <u>ALJ's Duty to Unrepresented Claimant</u>

When a claimant appears at a hearing pro se, "the ALJ must scrupulously and conscientiously probe into, inquire of and explore for all the relevant facts." <u>Reefer v. Barnhart</u>, 326 F.3d 376, 380 (3d Cir. 2003) (internal quotations omitted). "If it is clear that the lack of counsel prejudiced the claimant or that the administrative proceeding was marked by unfairness due to lack of counsel, this is sufficient for remand, or reversal." <u>Livingston v. Califano</u>, 614 F.2d 342, 345 (3d Cir. 1980). <u>See</u> <u>also</u> <u>Dobrowolsky</u>, 606 F.2d at 407 (stating that a reviewing court may remand a case for lack of counsel "only if supported by a showing of clear prejudice or unfairness at the administrative hearing.")

Plaintiff points to several things that she alleges supports her argument that the ALJ did not fulfill his enhanced duty during the hearing, thereby prejudicing and/or having an unfair impact on her case. Plaintiff argued that the ALJ "took advantage" of her, claiming that he only afforded her a twelve minute hearing and thus did not fully explore her case, never allowed her to see evidence or ask for objections to it and never asked if she would like to testify on her own without the ALJ asking questions. (Pl's Br. 6-12). The Court will address each in turn.

Plaintiff seems to allege that because her hearing was twelve minutes, the ALJ could not have met the standard set for him in this Circuit in a pro se hearing. This argument does not reflect the record of the hearing. A standard that only considers the length of the hearing, without more, could not accurately reflect the degree of inquiry achieved by the ALJ. There is no minimum threshold of time that can be set that would serve as a sole (or even main) indicator of a hearing's adequacy. A hearing of greater length may not develop the record as much as was

done in the present case.  It is the content of the hearing and not the length, that should be primarily examined.

At the hearing, the ALJ explained to Plaintiff that he would be asking her questions and when he is done, she would be able to bring up anything he did not inquire about or discuss with her that she felt was important.  (Tr. 23-24).  The ALJ inquired about Plaintiff's age, education, work history and daily life.  He also asked Plaintiff about her then known medical conditions, including symptoms she experienced (he would later ask for and receive additional medical documents first brought by the Plaintiff to the hearing, stating that he would look into them at a later time).  After a discussion of these conditions and symptoms, the ALJ listed Plaintiff's medical issues and asked if all her physical problems were covered, to which the Plaintiff replied she thought so.  (Tr. 31-32).  The ALJ also inquired about any treatment or medications she took for her medical conditions.  Near the end of the hearing the ALJ asked the Plaintiff to tell him anything they had not yet discussed and gave her an opportunity to respond.   The ALJ inquired about all subjects then before him and Plaintiff was given an opportunity to respond, expand on and clarify.  She was also allowed to add additional information not previously discussed during the hearing.  The ALJ stated that he would look into the then given documentation and indeed did as he referred to and considered them in his decision.  Thus, it is difficult to argue that the ALJ had "take[n] advantage of" the pro se Plaintiff at the hearing with respect to facts and issues explored.

Plaintiff also alleges that the ALJ did not let her see or object to the file under consideration.  This is not supported by the evidence before the court.  First, as discussed above, Plaintiff submitted new documentation at the hearing to be included in the file.  This implies that

she knew the documentation was not already in the file and was thus aware of the contents of the file.  Even if this inference is not correct, Plaintiff had been given an opportunity to examine the file prior to the hearing on at least two occasions.  On May 8, 2007, almost a year prior to the hearing, Plaintiff was sent a letter acknowledging receipt of her request for a hearing before the an ALJ. (Tr. 47-48).   The letter informed the Plaintiff that "[i]f you wish to see the evidence in your file, you may do so on the date of the hearing or before that date."  (Tr. 48).  On March 4, 2008, a month prior to her hearing, Plaintiff was mailed a Notice of Hearing from the Office of Disability Adjudication and Review.  This letter included a paragraph with the heading "You May Submit Additional Evidence and Review Your File" which read "[i]f there is more evidence you want to submit, get it to me right away.  If you cannot get the evidence to me before the hearing, bring it to the hearing.  If you want to see your file before the date of the hearing, call this office." (Tr. 53, emphasis added).  Thus, apparently if Plaintiff had not in fact actually seen the file and therefore was not able to state objections to it, it was not because she was not given the opportunity, but because she did not take action.[8]

Finally, the Plaintiff claims that she was not given an opportunity to testify on her own. This is simply not true.  The ALJ told Plaintiff prior to her sworn testimony that she would have an opportunity to add anything she feels important that they did not discuss through his questioning and the ALJ did in fact give Plaintiff that opportunity near the end of the hearing (indeed Plaintiff at that point more fully explained an answer to a question the ALJ had posed regarding her income).  Further, during the hearing the ALJ allowed the Plaintiff to add to the

---

[8]  The Court also notes that the Plaintiff has never stated specifically what evidence if any is missing or objectionable.

discussion any other physical ailments she had that were not discussed.  She believed, however, that all of her ailments were covered in his questioning and her responses.  (Tr. 32).  Therefore, the Plaintiff was both given the opportunity and took advantage of her opportunity to testify to supplement the ALJ's questioning

Plaintiff has not shown this court that the hearing was prejudicial or unfair. The ALJ properly met his duty to the pro se plaintiff by scrupulously and conscientiously probing into, inquiring of and exploring relevant facts.  The ALJ investigated the background of and various issues faced by the Plaintiff, giving her the opportunity to answer and supplement information to his inquiries.  Plaintiff was also given the opportunity to examine her file prior to the hearing, even if she did not take advantage of such an opportunity.  Finally, Plaintiff was specifically told of her opportunity to add her own testimony at the hearing and did so.  In this case, Plaintiff's hearing was fundamentally fair and not prejudicial and there is no specific ground for a remand because the ALJ met the proper standard of conduct at a hearing with a pro se plaintiff.

### B.  COMPARING SEVERE IMPAIRMENT(S) TO LISTING - STEP  3

In his decision, the ALJ found, in his step two analysis, that Plaintiff had eight severe impairments, which he identified as severe because they had more than a minimal effect on the Plaintiff's ability to perform basic work activities, such as lifting and carrying. (Tr. 17).  These severe impairments were: uterine prolapse; left knee arthritis; arthritis of the right hip; status-post fracture; status-post right hip fusion surgery; a history of a fracture of the pelvis; hypertension; neck pain; and obesity. (Tr. 17).

In his step three analysis, the ALJ examined and compared the following impairments: first degree genital prolapse; right hip and pelvic fractures; status-post right hip surgery; arthritis

of the left knee; hypertension; and neck pain. (Tr. 17-18).   He then considered obesity in connection with all the other coexisting or related impairments. (Tr. 18).  The Court will look at each in turn.

The ALJ first looked at the claimant's impairment pertaining to first degree general prolapse. (Tr. 17).  He noted that Dr. Rahula had stated that the Plaintiff was not a candidate for surgery and indicated that she could perform light work.  The ALJ cited to Dr. Wilchfort's report where Dr. Wilchfort found that the Plaintiff was not in acute distress and had no difficulty getting on or off the examination table.  The ALJ then noted Plaintiff's testimony that she is able to do activities of daily living such as cooking and laundry.  The ALJ found that claimant's uterine prolapse did not meet or equal any in the Listings.

The ALJ next discussed the records and evidence pertaining to claimant's joint impairments (including records submitted by Plaintiff at the hearing). (Tr. 17-18).   Citing Dr. Wilchfort's report, the ALJ noted Plaintiff's limited flexion of her right hip, that Plaintiff could not squat because of hip pain and that while arthritis of her left knee was noted, Plaintiff had a normal gait.  The ALJ stated that despite the claimant's right hip and left knee problems, the record did not show an inability to ambulate effectively as defined by Listing 1.00B2b.  Further, the Plaintiff had testified that a cane had not been suggested.  The ALJ also saw no evidence of non-union of the claimant's pelvic fracture and therefore found claimant does not equal Listings 1.02(A), 1.03, or 1.06.

The ALJ then looked at Plaintiff's hypertension, which was noted to have been uncontrolled at times. (Tr. 18).  The ALJ noted Plaintiff's visit to the Emergency Room on August 16, 2007 for near syncope and the EKG revealing a septal mycardial infraction, age

undetermined, with sinus arrhythmia, but a cardiac injury marker was within normal limits.

Plaintiff did not testify that heart disease was a problem.  The record did not document visual

impairment, impairment of renal functioning or stroke residuals.  The ALJ thus found that

Plaintiff's hypertension has not resulted in significant end organ damage and does not meet or

equal any of the Listings.

The ALJ next analyzed Plaintiff's neck pain, finding no evidence of a disorder of the

spine as meeting or equaling those found in Listing 1.04(A). (Tr. 18).  The ALJ noted that while

plaintiff reported some neck pain and x-rays revealed osteophytes at the fourth through sixth

cervical vertebrae, Dr. Wilchfort's report showed Plaintiff had full range of motion of her neck

and upper extremities.

The ALJ also stated that the Plaintiff suffered with obesity. (Tr. 18).  He reported that

Plaintiff was sixty-five inches tall and her weight ranged from 204-208 pounds.

The ALJ considered each of these severe impairments and the combination of the same,

in determining that they did not meet or medically equal one of the listed impairments in 20 CFR

Part 404, Subpart P, Appendix 1.  The Court finds that the ALJ's determination is supported by

substantial evidence.

At the third step of the analysis, Plaintiff "bears the burden of presenting medical findings

showing that her impairment meets or equals a listed impairment." Hernandez v. Comm'r of Soc.

Sec., 198 Fed. Appx. 230, 234 (3d Cir. 2006).  To show an impairment or combination of

impairments is "equivalent" to a listed impairment, the claimant "must present medical findings

equal in severity to all the criteria for the one most similar listed impairment." Sullivan v. Zebley,

493 U.S. 521, 531 (1990) (emphasis in original).

Plaintiff argues that the ALJ improperly considered the combined effects of her severe impairments in his step three analysis and failed to compare such combined effects of those found in the Listings. (Pl.'s Br. 13-20).  Plaintiff also argues that her hypertension should have been compared to Listing 4.05 (recurrent arrhythmias).  The Court will discuss the latter argument first. (Pl.'s Br. 14-18).

To meet the requirements of Listing 4.05, in relevant part, a Plaintiff must show evidence of recurrent arrhythmias resulting in uncontrolled, recurring episodes of cardiac syncope or near syncope, despite prescribed treatment and documented by medically accepted testing. See 20 C.F.R. Part 404, Subpart P, Appendix 1, 4.05.  Plaintiff can neither make this showing, based on the record, nor show that her impairment equals this.  Plaintiff produced one report from the Emergency Room indicating a single episode of near syncope (of August 17, 2007, outlined supra), which was considered by the ALJ in his determination of whether Plaintiff's hypertension met or medically equaled a listed impairment.  This one documented incident is not of the uncontrolled, recurring episodes occurring despite prescribed treatment that is listed in 4.05, nor did the ALJ deem it as equivalent to such an impairment.  The Court finds that the ALJ properly took into consideration the medical evidence in the file to reach that conclusion.

In his analysis on Plaintiff's obesity impairment, the ALJ combined the impairments Plaintiff suffers from. (Tr. 18).  Citing to SSR 02-1p, the ALJ noted that obesity may increase the severity of coexisting impairments to the extent that the combination of impairments meets or equals the requirements of a listed impairment, especially for musculoskeletal, respiratory and cardiovascular systems.  The ALJ found that the record does not document severe cardiovascular or respiratory disease.  The ALJ stated that in the present case, although the claimant has arthritis

of the right hip, status-post fracture and fusion surgery, arthritis of the left knee and uterine prolapse, she is able to ambulate without an assistive device and perform activities of daily living, such as household chores.  Further, even when obesity is considered in combination with the claimant's other impairments, as the ALJ stated, Plaintiff does not meet or equal the criteria of any of the listed impairments.

Based on the evidence presented, the Court agrees with this conclusion.  Plaintiff has several severe impairments, as the ALJ finds, but despite all of these impairments considered together and any degree of hardship they may cause together, Plaintiff can still ambulate without an assistive device, perform activities of daily living (described in more detail below) and does not have documented severe cardiovascular or respiratory disease.  The ALJ analyzed Plaintiff's impairments and effects of such impairments, separately and in combination, finding nothing that equaled the criteria of any of the listed impairments.  The Court affirms this.

### C.  RESIDUAL FUNCTIONING CAPACITY DETERMINATION AND RESUMING PAST WORK- STEP 4

#### 1.  Sedentary Work

Plaintiff next argues that the ALJ erred by finding that she was able to resume past relevant work as a clerical banker as it was not sustainable by the evidence or the findings in the RFC.  (Pl.'s Br. 24-26).  Plaintiff avers that the ALJ's conclusion that she is not disabled because she can resume her past work is not supported by the substantial evidence of record. (Pl.'s Br. 25-26).  That is, Plaintiff states that she can no longer perform the past relevant work because she can no longer sit all day, which she stated at the hearing in front of the ALJ in relation to his question of whether she can perform her old clerical job. (Pl.'s Br. 25-26).

The ALJ must assess whether Plaintiff's RFC enables her to perform past relevant work.[9] McQueen v. Comm'r of Soc. Sec., 322 Fed. Appx. 240, 243-44 (3d Cir. 2009).  "If the claimant is capable of performing past relevant work, she is not considered disabled under the Social Security regulations."  Beety-Monticello v. Comm'r of Soc. Sec., 343 Fed. Appx. 743, 746 (3d Cir. 2009) (citing 20 C.F.R. § 404.1520(f)). See also Weakland v. Astrue, 2009 WL 734713, * 3 (W.D. Pa. Mar. 19, 2009) ("[I]t is well settled that disability is not determined merely by the presence of impairments, but by the effect that those impairments have upon an individual's ability to perform substantial gainful activity.") (citing Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991).

Under SSR 82-62, in relevant part, when comparing the Plaintiff's RFC with the physical and mental demands of past relevant occupations:

> The claimant is the primary source for vocational documentation, and statements made by the claimant regarding past work are generally sufficient for determining the skill level, exertional demands and nonexertional demands of such work. Determination of the claimant's ability to do [past relevant work] requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet these requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work....

[SSR 82-62, http://www.socialsecurity.gov/OP_Home/rulings/di/02/SSR82-62-di-02.html]

In making his determination, the ALJ considered and evaluated Plaintiff's testimony, as well as medical records relevant to Plaintiff's ability to perform such relevant work.  The ALJ described

---

[9]  The RFC is an assessment of the most a claimant can do in a work setting despite her impairments.  20 C.F.R. §§ 404.1545 and 416.945.

Plaintiff's relevant past work experience as sedentary[10] (her clerical positions in the bank) and

light to medium capacity (her more recent retail positions). (Tr. 19).  The ALJ noted that

Plaintiff's previous sedentary work included doing research, a lot of paperwork, filing and

dealing with the management team. (Tr. 14).  Based on her testimony and records, the ALJ

analyzed Plaintiff's RFC as compared to sedentary work.

        The ALJ found that Plaintiff's impairments did not result in disabling functional

limitations.  (Tr. 18-19).  Where the ALJ did see some limitations in Plaintiff's functional ability,

he described them.  For example, the ALJ stated that Plaintiff's uterine prolapse precludes her

from lifting, bending and standing for long periods,[11] but according to her own testimony,

Plaintiff is able to do the activities of daily living, such as cooking and laundry.  The ALJ

concluded that Plaintiff's activities of daily living are fully functional and that she is able to do

all household chores and uses public transportation. (Tr. 19).

        The Court finds substantial support in the record for the ALJ's conclusion of Plaintiff

being able to perform activities of daily living.  Plaintiff stated that she took care of three

children in her household, assisting them in getting ready for school and doing homework.(Tr.

15, 98-99, 129-30).  She also cooks and does laundry for the household (Tr. 15, 101, 129-30,

132).  The Plaintiff uses public transportation, such as buses and taxi cabs.  (Tr. 19, 31, 102,

---

[10] Sedentary work is work involving "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

[11] The ALJ also stated that these limitations may also occur because of her neck pain. (Tr. 20).

133).  In looking at the record as a whole, it is obvious to this Court that the Plaintiff does this to

support herself and especially the three children in their everyday lives.  Although she does these

tasks with various degrees of discomfort, she is capable of and does in fact actually perform these

tasks.  Therefore, the Court can not disrupt the ALJ's findings.

Further, any limitations Plaintiff may have would not so impact her that she would not

have been able to perform sedentary work.  The ALJ found that Plaintiff could perform sedentary

work as defined in 20 C.F.R. § 403.1567 (lifting and carrying up to ten pounds occasionally and

five pounds frequently; standing/walking up to two hours in an eight hour day; and sitting up to

six hours in an eight-hour day).[12]  As explained above, Plaintiff's activities of daily living show

her to be capable of this.  In addition, the medical records relied upon by the ALJ supports this

conclusion.  In his report, Dr. Rahula found that Plaintiff was limited in carrying a maximum of

ten pounds, could stand and/or walk for up to six hours, sit without limitation and had limited

pushing and/or pulling abilities. (Tr. 160).  Dr. Rahula did not note any other limitations limiting

Plaintiff's ability to do work related activities.[13]  Dr. Wilchfort's report, (Tr. 169-171), more

---

[12]  Plaintiff states that, pursuant to SSR 82-62, the ALJ did not engage in a "task-by-task"
analysis comparing past work with the RFC.  (Pl.'s Br. 24-25).  Although the ALJ did not engage
in a detailed explanation in comparing the Plaintiff's RFC with her past relevant work as a
clerical bank worker in his step four analysis, the Court finds that the underlying record and the
ALJ's decision and determinations, read as a whole, were sufficiently developed to show proper
consideration was given to Plaintiff's ability to perform the sedentary work.  See, e.g., Garibay v.
Astrue, 2008 WL 3192702, *9 (D.N.J. Aug. 5, 2008) (finding the ALJ's conclusion supported by
substantial evidence where although the ALJ never engaged in a detailed analysis of what
secretarial work entails, the work is considered sedentary and the ALJ's reasoning behind the
Plaintiff's RFC is sufficiently explained and supported by substantial evidence).

[13]  In contrast, in his RFC Assessment, Dr. Galakos stated that Plaintiff was limited in
only occasionally lifting/carrying a maximum of twenty pounds while frequently being able to
lift/carry a maximum of ten pounds, could stand and/or walk (with normal breaks) about six
hours in an eight-hour work day, could sit (with normal breaks) about six hours in an eight-hour

fully detailed in this Opinion <u>supra</u> (Section (1)(B)(2)(II)), noted that Plaintiff's gait is normal, her right hip flex is forty-five to fifty degrees (compare to 100 degrees for the left), her right leg raising is forty degrees (compared to sixty degrees on the left) and her left knee flexion was 100 degrees with normal extension (compared to normal flexion and extension of the right knee). Plaintiff was also found to have normal range of motion in the hands, wrists and elbows. Her ankles were also normal. Plaintiff complained of pain with walking. (Tr. 171). Hence, the medical opinions relied on by the ALJ, from Doctors Rahula, Wilchfort and Galakos, all support the ALJ's conclusion that Plaintiff can perform sedentary work. The medical records submitted by Plaintiff at the hearing, considered by the ALJ in reaching his decision, do not alter that conclusion.

## 2. **Resuming Past Work**

Although Plaintiff argues that the ALJ did not give Plaintiff's testimony of being able to do her former clerical job as long as she does not have to sit for long periods of time much credence, the record supports the ALJ's determination. When describing her work background, specifically her previous clerical job, Plaintiff had described it in general terms, stating that her job entailed "office work, filing, research and sitting all day." (Tr. 145). However, in response to a specific question in connection to her claim for disability regarding her physical exertion at her previous clerical job, Plaintiff had stated that she walked for one hour, stood for one hour and sat

---

work day, did not have pushing or pulling abilities and had postural limitations that only occasionally allowed Plaintiff to climb, kneel, crouch, etc. Dr. Galakos listed no other limitations. (Tr. 174-81). The limitations reported by Dr. Galakos would also fall within the category of being able to do sedentary work.

for six hours each work day. (Tr. 118).[14]  Further, Plaintiff had previously stated in several of her reports that she either had no limitations in sitting or could sit for four hours before her hip would begin to hurt.  (See Tr. 104, 127).

Therefore, the ALJ's conclusion that Plaintiff can perform the sedentary work of her former clerical position is supported by both the Plaintiff's submissions as well as the medical evidence presented.  As such, the Court holds that the ALJ's determination that Plaintiff is "not disabled" because she is able to perform work-related activities as a clerical bank worker that are not precluded by her RFC is supported by substantial evidence. See, e.g., Figueroa v. Astrue, 2009 WL 5206284, *6 (D.N.J. Dec. 22, 2009) (stating that the ALJ's determination that Plaintiff's back disorder does not render her "disabled" since she is able to perform past relevant work is supported by substantial evidence where the ALJ relied, in part, on both Plaintiff's testimony that her previous jobs required her to stand and a lack of medical evidence preventing Plaintiff from standing at work).

### D.  CREDIBILITY

Along with the objective medical evidence presented, an ALJ also looks at a claimant's subjective statements, such as his or her statements about symptoms, including pain.  20 C.F.R. § 416.929(a).  Using these subjective statements, the ALJ evaluates the intensity and persistence of claimant's symptoms, such as pain and determines to what extent it prevents him or her from doing work.  20 C.F.R. § 416.929(c).  "Allegations of pain and other subjective symptoms must be supported by objective medical evidence." Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir.

---

[14] Plaintiff also stated that the heaviest weight she lifted at this position was less than ten pounds, carrying files to meetings. (Tr. 118).

1999) (citing 20 C.F.R. § 416.929).  The ALJ is required to evaluate and assess the degree to which the claimant is accurately stating his or her subjective symptoms or the extent to which they are disabling.  Myers v. Barnhart, 57 Fed. Appx. 990, 996 (3d Cir. 2003).  Factors relevant to symptoms, which the ALJ will consider include: (1) daily activities; (2) location, duration, frequency and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, claimant has received for relief; (6) any measures have or used to alleviate pain; and, (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3)(i)-(vii).

Here, the ALJ found the Plaintiff to be a pleasant and very credible witness, and that her medically determinable impairments could reasonably be expected to produce the alleged symptoms.   However, the Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not deemed credible where they were inconsistent with the RFC assessment. (Tr. 18-19).   This determination was made considering all symptoms and the extent to which they can reasonably be accepted as consistent with the objective and other medical evidence. (Tr. 18-19).  Plaintiff is able to take care of three children in her home, do house chores (cooking, some cleaning and laundry) and take public transportation.  Plaintiff occasionally uses over the counter pills but has not been prescribed medication, nor has it been suggested that she use a cane to ambulate.  Although she does suffer from pain, Plaintiff's impairments do not prevent her from all types of work.  After reviewing the medical reports and Plaintiff's own subjective testimony, the ALJ concluded that Plaintiff can perform sedentary work, including that of her former position as a clerical worker in a bank.  This determination is

clearly supported by substantial evidence.

### V. <u>CONCLUSION</u>

For the reasons stated, this matter is **affirmed**. An appropriate order follows this opinion.


 S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Date:          September  30  , 2011
Original:      Clerk's Office
cc:            All Counsel of Record